Oasis Invs. II Master Fund Ltd. v Mo (2024 NY Slip Op 50520(U))

[*1]

Oasis Invs. II Master Fund Ltd. v Mo

2024 NY Slip Op 50520(U)

Decided on May 2, 2024

Supreme Court, New York County

Borrok, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 2, 2024
Supreme Court, New York County

Oasis Investments II Master Fund Ltd., LORELEI NCC INC., Plaintiff,

against
Vincent Tianquan Mo, RICHARD JIANGONG DAI, ACE SMART INVESTMENTS LIMITED, NEXT DECADE INVESTMENTS LIMITED, MEDIA PARTNER TECHNOLOGY LIMITED, TRUE KNIGHT LIMITED, Defendant.

Index No. 652607/2023

Plaintiffs by:
Reid Collins & Tsai LLP, 420 Lexington Avenue Suite 2731, New York, NY 10170
Defendants by:
QUINN, EMANUEL, URQUHART & SULLIVAN, 51 Madison Ave Fl 22nd, New York, NY 10010
ELLIOTT KWOK LEVINE & JAROSLAW LLP, 565 5th Ave, New York, NY 10017

Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 005) 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 113, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 174, 175, 176, 177, 178, 179, 180, 183 were read on this motion to/for DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 006) 103, 104, [*2]111, 172, 181, 184 were read on this motion to/for DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 007) 105, 106, 107, 108, 109, 110, 112, 173, 182, 185 were read on this motion to/for DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 008) 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 201, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221 were read on this motion to/for STAY.
Upon the foregoing documents and for the reasons set forth below, the motions to dismiss (Mtn. Seq. Nos. 005, 006 & 007) are denied. The motion to stay (Mtn. Seq. No. 008) pending resolution of the motion to dismiss is denied as moot.
The Relevant Facts and Circumstances
According to the well pled amended complaint (the AC; NYSCEF Doc. No. 15), Messrs. Vincent Tianquan Mo and Richard Dai, used and manipulated the New York financial market in a multi-step Transaction (hereinafter defined) to loot Fang (hereinafter defined) and enrich themselves in breach of their fiduciary duties (id., ¶1). As discussed below, the causes of action asserted in this lawsuit arise from New York contacts where there is an articulable nexus or substantial relationship between the Transaction and the claims asserted such that New York has specific jurisdiction over Fang and Messrs. Mo and Dai (see Renren, Inc. v XXX, 67 Misc 3d 1219(A) [Sup Ct 2020], affd sub nom. Matter of Renren, Inc., 192 AD3d 539 [1st Dept 2021]).
Mr. Mo was Fang's controlling shareholder and chairman until he stepped down on February 28, 2022 (id., ¶¶ 44-46). Mr. Dai is Mr. Mo's nephew who replaced him as chairman of Fang's board after Mr. Mo stepped down (id, ¶¶ 12, 24). 
The Transaction foisted upon Fang by Messrs. Mo and Dai included (i) Fang to first spin-off of its valuable wholly owned subsidiary, CIH (hereinafter defined), as a separate publicly traded entity in New York, (ii) Fang to purchase CIH shares both on the New York market (which the defendants first artificially inflated and then artificially deflated) and from Messrs. Mo and Dai's affiliates (which Fang purchased from them at nearly double the then-market price in New York), (iii) Fang to delist from the NYSE to further depress the value of CIH on the New York market so that they could buy CIH shares back on the cheap, and finally (iv) Fang to participate in a CIH take private transaction, pursuant to which Messrs. Mo and Dai forced Fang to shell out approximately $130 million to buy a 35.8% minority interest in CIH (which Fang had owned outright (100%) just a few short years prior) all so that Messrs. Mo and Dai could line their pockets with those amounts at Fang's expense (id., ¶ 156). 
To be sure — the Transaction was not the first time that Messrs. Mo and Dai came to New York with Fang and availed themselves of the New York financial markets, which they now claim both (i) lacks jurisdiction and (ii) is an inconvenient forum for them to litigate. In 2010, they first came to New York and "rang the bell" of the New York Stock Exchange to herald the listing of Fang's (then known as SouFun Holdings Limited) ADSs on the NYSE (id., ¶ 2). 
SouFun Holdings Limited (now known as Fang) is an exempted company incorporated with limited liability in the Cayman Islands (id., ¶ 26). Plaintiff Oasis Investments II Master Fund Limited is an exempted company incorporated under the laws of the Cayman Islands, [*3]which is "principally engaged in the provision of [services] to the real estate and home furnishing industries in the PRC" (id., ¶¶ 18, 27). Plaintiff Lorelei NCC Inc. is a New York corporation whose seat of management is in New York (id., ¶ 19). 
Step 1: Return to New York to Spin-Off of a Valuable Fang Asset on the NASDAQ
Years later, on June 11, 2019 (and well within the six year statute of limitations as this lawsuit was filed on May 29, 2023), and as the first step in the Transaction (Step 1), Messrs. Mo and Dai returned to New York to cause Fang to spin off its highly profitable, wholly owned subsidiary China Index Holdings Limited (CIH) as a new publicly traded company by listing CIH's ADSs on the NASDAQ (id., ¶¶ 8, 58). In connection with the spin-off, CIH deposited its shares with JPMorgan Chase Bank, N.A. in New York (id., ¶ 28). The depository agreement (NYSCEF Doc. No. 172) provides that suits arising out of the agreement can be brought in New York and CIH consents to jurisdiction in New York:
The Company irrevocably agrees that any legal suit, action or proceeding against the Company brought by the Depositary or any Holder or Beneficial Owner, arising out of or based upon this Deposit Agreement, the ADSs or the ADRs or the transactions contemplated hereby or thereby, may be instituted in any state or federal court in New York, New York, and irrevocably waives any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the non-exclusive jurisdiction of such courts in any such suit, action or proceeding. The Company also irrevocably agrees that any legal suit, action or proceeding against the Depositary brought by the Company, arising out of or based upon this Deposit Agreement, the ADSs, the ADRs or the transactions contemplated herein, therein or hereby, may only be instituted in a state or federal court in New York, New York. 
(NYSCEF Doc. No. 127, § 20[b]). In the spin-off, Fang shareholders (including Messrs. Mo and Dai), received CIH ADSs on a pro rata basis based on their holdings in Fang (NYSCEF Doc. No. 15, ¶ 8). As alleged, Step 1 was critical to the Transaction because it afforded Mr. Mo the opportunity to monetize his holdings in Fang without incurring the risks of a direct sale and in a way that permitted him to enrich himself and his affiliates at Fang's expense (id., ¶¶ 61-65). 

Step 2: The Defendants Sell Back the CIH Shares They Acquired in the NASDAQ Spin-Off to Fang at Twice the Market Value AND have Fang Buy CIH Interests on the NY Market
Shortly thereafter, and as step two in the Transaction (Step 2), Mr. Mo caused Fang to purchase a total of $81.2 million in CIH interests from Mr. Mo's affiliates at a grossly inflated price of $5.99 per interest, which dwarfed the prevailing NASDAQ market rates of $3.32 on December 27, 2019, and $2.48 on June 23, 2020, when these affiliated purchases took place (id., ¶¶ 9, 66-74). Mr. Mo also simultaneously had Fang purchase CIH interests on the New York market, at least partly to disguise these sales to his affiliates and to minimize the appearance of Mr. Mo's improper additional compensation (id., ¶ 9, 39). 
The net result of Step 2 was that Fang paid $95.4 million to acquire an 18.5% non-controlling interest in CIH which it had previously wholly owned (without paying any of such [*4]$95.4 million). This, as alleged, was just so that Mr. Mo and his affiliates could put approximately $81.2 million (of the $95.4 million) into their own pockets (id., ¶¶ 10, 82); Neither Mr. Mo nor his affiliates sold any CIH interest to anyone other than Fang during this period. Why would they given that Fang paid nearly double the market rate — i.e., what Mr. Mo and his affiliates could get from anyone else! (id., ¶ 82). 
On August 24, 2020, after squandering tens of millions of Fang's money in the prior months by purchasing CIH interests far above market (as discussed above), Fang announced an issuance of up to $30 million class A shares to management to raise capital (id., ¶ 95). 
The Cayman Petition to Wind-up Fang
Shortly after Mr. Mo initiated Step 2, on November 13, 2020, Fang shareholders (led by an Evenstar fund) filed a winding-up petition in the Cayman Islands, seeking appointment of a provisional liquidator in light of Mr. Mo's malfeasance and numerous breaches of his fiduciary duties (the Cayman Action; id., ¶¶ 96-98). The Cayman Action was seemingly amicably resolved (thus ending the risk of a liquidator being appointed) by order of a Cayman court on July 20, 2021, with Evenstar's nomination of a new Fang director (id., ¶ 99). Fang (via Mr. Mo) also settled any debt default disputes that were triggered by the filing of the Cayman Action, repaying the relevant debt instruments in full by December 31, 2021 (id., ¶¶ 100-101). 
Step 3: Cause Fang to Delist from the NYSE
Approximately four months after the Cayman Action was commenced, Fang (via Messrs. Mo and Dai) ceased to provide the SEC with mandatory financial reporting, insisting that there were questions as to Fang's ability to continue as a going concern after they had looted it (id., ¶¶ 15-16, 40, 103, 109, 112). They did this solely in order to cause Fang's delisting from the NYSE (Step 3). As discussed below, this was a total sham because the Cayman Action was resolved in mid-2021 and Fang was delisted in June 2022. Indeed, Fang's last substantive filing was made on March 25, 2021 (id., ¶ 102). On May 24, 2021, Fang announced it was in communication with the NYSE concerning a possible Fang delisting owing to filing issues (id., ¶ 134). Thereafter, and after multiple NYSE notifications of noncompliance, Fang was ultimately delisted on June 2, 2022 (i.e., more than 6 months after all Cayman Action issues had been resolved) (id., ¶¶ 14, 102-110).
In other words, inasmuch as the Cayman Action was resolved as of mid-2021 and any events of default were resolved by the end of 2021, the winding-up petition in the Cayman Islands did not justify withholding SEC filings beyond, at the latest, the end of 2021, because (i) questions over whether Fang could operate as a going concern had been resolved and (ii) there was no longer any threat of dissolution (id., ¶ 15).[FN1]

Despite this, however, Messrs. Mo and Dai used the Cayman Action as a pretext to cause Fang to "go dark" by not filing required forms with the SEC, all to enable them to proceed with the next step in looting Fang.
Step 4: Use the Artificially Depressed New York market that Messrs. Fang and Mo caused to buy-up Fang and CIH Shares back
The fourth step (Step 4) was to (i) use the specter of delisting from the NYSE to tank Fang's trading price directly, (ii) indirectly suppress the market price for CIH on the NASDAQ because of its strong interrelation with Fang, and (iii) to scoop up (a) large swathes of Fang and CIH shares from select investors (with such private purchases necessarily taking place against a backdrop of the artificially deflated New York market prices of Fang and CIH — because Messrs. Mo and Dai purposefully tanked the stocks) and (iv) (b) shares directly from the artificially depressed New York market (id., ¶¶ 11-13, 102-105, 124-126). The AC alleges that this "going dark" was neither legitimate nor justified because, among other things, there was never a true risk to Fang's ability to operate as a going concern (id., ¶¶ 111-115, 162-166) and even if there was, a going-concern qualification could have easily been included by Fang's auditors in any financial filings (id., ¶ 120; see id., ¶¶ 113-119). Instead, the AC alleges that this "going dark" was motivated purely by the desire to further loot Fang's coffers (id., ¶ 122). 
Between March of 2021 (when Fang filed its last SEC filing) and June 2, 2022 (when Fang was ultimately delisted from NYSE), Messrs. Mo and Dai carried out Step 4 — their affiliated entities purchased at a steep discount 24.8% equity in Fang and 22.6% equity in CIH from other Fang investors and on the New York market — the exact market that they had artificially depressed through their wrongdoing (id., ¶ 14, 117, 123-137, 161-173). 
Step 5: Fang then offered to take the New York spun-off CIH private by buying out CIH's remaining minority investors
A mere two months after Fang's delisting, in a fifth and final step (Step 5; Step 1, Step 2, Step 3, Step 4 and Step 5, hereinafter, collectively, the Transaction), Fang announced it would sponsor a take private transaction by supplying $14.8 million in equity financing to buy out CIH's remaining minority investors, despite prior insistences that Fang was in danger as a going concern (id., ¶¶ 16, 118). As a part of Step 5, Fang, Messrs. Mo and Dai, and the other defendants executed a certain Equity Contribution Agreement (the Equity Agreement; NYSCEF Doc. No. 100). The Equity Agreement provides for New York law and permits jurisdiction to be asserted in the Cayman Islands:
(i) This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be interpreted, construed and governed by and construed in accordance with the Laws of the State of New York, [*5]without giving effect to any choice of law or conflict of law rules or provisions that would cause the application of the Laws of any jurisdiction other than the State of New York, except that matters arising out of or relating to the conversion, exchange or cancellation (as applicable) of the Shares (including Shares represented by ADSs) contemplated by this Agreement shall be interpreted, construed and governed by and in accordance with the Laws of the Cayman Islands in respect of which the parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of the courts of the Cayman Islands.
(id., § 13[l][i].) The CIH take private transaction closed on April 17, 2023; the CIH shares were priced at $1.00 each in a short form merger, which Messrs. Mo and Dai could only avail themselves of because of the overwhelming number of shares they were able to vote in favor of the transaction (i.e., their own shares, the shares of their affiliates, and the CIH shares Fang held) (id., ¶¶ 16, 140-145, 151). Significantly, Messrs. Mo and Dai voted Fang's shares in favor of the short form merger, and despite committing itself in the amount of $14.8 million and voting its shares in favor of the transaction, Fang never (i) conducted diligence of any kind, (ii) formed a special committee of disinterested directors at Fang to assess the transaction, or (iii) retained independent counsel or financial advisors (id., ¶¶ 147-151). 

The Plaintiffs then brought this lawsuit by Summons and Complaint (NYSCEF Doc. No. 1) on May 29, 2023, alleging various breaches of fiduciary duty on the parts of Messrs. Mo and Dai. The Defendants moved to dismiss (Mtn. Seq. Nos. 005, 006 & 007), based on lack of personal jurisdiction, forum non-conveniens under CPLR 327, and by arguing that the action is time-barred under CPLR 202.

 DISCUSSION
I. THE MOTIONS TO DISMISS BASED ON LACK OF PERSONAL JURISDICTON ARE DENIED
On a motion to dismiss pursuant to CPLR § 3211 (a)(8), the plaintiff bears the ultimate burden to establish a basis for personal jurisdiction (Nick v Schneider, 150 AD3d 1250, 1251 [2d Dept 2017]). But to survive a motion to dismiss pursuant to CPLR § 3211 (a)(8), "the plaintiff need only make a prima facie showing that the defendant is subject to the personal jurisdiction of the court" (Whitcraft v Runyon, 123 AD3d 811, 812 [2014]). 
A. The Court has Jurisdiction over Fang
In support of its motion to dismiss, Fang argues that CPLR § 302(a)(1) does not apply because there is no articulable nexus between the causes of action asserted in the AC and Fang's transaction of business in New York. Fang also argues that the exercise of personal jurisdiction over it would not comport with due process because it lacks minimum contacts with New York. Specifically, Fang argues that neither its own IPO on the NYSE nor CIH's listing on the NASDAQ establishes a basis for personal jurisdiction because (i) any connection between those activities and the claims in this action are too attenuated and (ii) because the buybacks of CIH shares at exorbitant prices and other large private purchases of CIH shares were done via [*6]agreements between foreign entities, and (iii) the take private transaction was a Cayman Islands-centered transaction with only insignificant New York ties. Fang argues that the choice of law provisions in the various agreements it signed do not confer personal jurisdiction because the claims at issue arise chiefly under the Cayman Islands take private transaction and other foreign agreements rather than the agreements containing New York designations. 
In addition, Fang argues that its use of New York communications and payments to JPMorgan in New York in its role as a depository bank are an insufficient predicate for personal jurisdiction because those contacts are ministerial in nature and were merely legal and logistical requirements attendant to the listing of the ADSs. Moreover, Fang argues that, although the roll-over of CIH ADSs into shares required the delivery of notices and fees to JPMorgan, these steps are purely ministerial and thus do not establish that Fang projected itself into New York. These arguments all fail.
The Court Does Not Have General Jurisdiction CPLR 301 over the Defendants
A court may exercise general jurisdiction over a defendant pursuant to CPLR § 301 on all causes of action where the defendant's ties to New York "are so 'continuous and systematic' as to render them essentially at home in the forum state" (Goodyear Dunlop Tires Operations, S.A. v Brown, 564 US 915, 919 [2011], quoting International Shoe Co. v Washington, 326 US 310, 317 [1945]). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile" (Goodyear, 654 US at 924). For a corporation, the paradigm forums are "the place of incorporation and [its] principal place of business" (Daimler AG v Bauman, 571 US 117, 137 [2014]). Only in an "exceptional case" will a corporation be subject to general jurisdiction in any other forum (id. at 138, n 19). 
Fang is an exempted company incorporated with limited liability in the Cayman Islands (NYSCEF Doc. No. 15, ¶ 26). Messrs. Mo and Dai are citizens of the People's Republic of China (id., ¶¶ 20, 24). Defendant ACE Smart Investment Limited is a Hong Kong entity that is based in Hong Kong (id., ¶ 21). Defendants Next Decade Investments Limited, Media Partner Technology Limited, and True Knight Limited (hereinafter, collectively, the Affiliates) are British Virgin Islands companies that are based in the British Virgin Islands (id., ¶¶ 22-23, 25). None of these Defendants are incorporated in New York, have their principal places of business in New York or are residents of New York. Because no exceptional circumstances are alleged, the defendants are not subject to general jurisdiction pursuant to CPLR § 301.
The Court does however have specific CPLR 302 jurisdiction over Fang
A New York court may exercise personal jurisdiction over a non-domiciliary defendant where (i) the court has long-arm jurisdiction over the defendant pursuant to CPLR § 302 and (ii) the exercise of such jurisdiction comports with the strictures of due process (Williams v Beemiller, Inc., 33 NY3d 523, 528 [2019]). As the Court of Appeals explained, this is a multi-pronged test: "[i]f either the statutory or constitutional prerequisite is lacking, the action may not proceed" (id.). Unlike general jurisdiction, long-arm (or specific jurisdiction) "is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction" (Goodyear, 564 US at 919). In other words, "the suit must aris[e] out of or relat[e] to the defendant's contacts with the forum" (Bristol-Myers Squibb Co. v Superior Ct. of Cal., [*7]San Francisco County., 137 S Ct 1773, 1780 [2017] [emphasis in original] [internal quotation marks and citation omitted]).
New York's long-arm statute provides that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state" (CPLR § 302 [a][1]). This is a "single act statute," meaning that "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted" (Kreutter v McFadden Oil Corp., 71 NY2d 460, 467 [1988]). 
The exercise of personal jurisdiction must also comport with constitutional due process (D & R Glob. Selections, S.L. v Bodega Olegario Falcon Pineiro, 29 NY3d 292, 298 [2017]). Due process requires that a defendant must have sufficient minimum contacts with New York such that the defendant should reasonably expect to be haled into court here (LaMarca v Pak-Mor Mfg. Co., 95 NY2d 210, 216 [2000], quoting World-Wide Volkswagen Corp. v Woodson, 444 US 286, 297 [1980]), and that requiring the non-domiciliary to defend the action in New York comports with "traditional notions of fair play and substantial justice" (LaMarca, 95 NY2d at 216, quoting International Shoe Co., 326 US at 316). "The 'minimum contacts' test 'has come to rest on whether a defendant's conduct and connection with the forum State are such that it should reasonably anticipate being haled into court there'" (Rushaid, 28 NY3d at 331, quoting LaMarca, 95 NY2d at 216 [internal quotation marks and citations omitted]). The inquiry is whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State" (id.). The defendants are subject to personal jurisdiction under New York's long arm-statute.
Renren, Inc. v XXX, 67 Misc 3d 1219(A) [Sup Ct 2020], affd sub nom. Matter of Renren, Inc., 192 AD3d 539 [1st Dept 2021] is instructive. In that case, Messrs. Joseph Chen and David Chao were alleged to have engaged in a multi-step transaction designed to strip Renren, Inc. (Renren) of its most valuable assets by manipulating the New York markets. In that case, the Appellate Division held that the because the Plaintiffs established that the Defendants transacted business in New York for the purposes of CPLR 302(a)(1) and that jurisdiction comported with due process, jurisdiction in New York was proper.
Given the similarities between Renren and this case, the facts of Renren bear recitation. Renren was a Cayman Islands company with its principal place of business in China (id., at *1). As alleged in that case, Messrs. Chen and Chao used the New York markets to take Renren, the Chinese version of Facebook that quickly rose to prominence once Facebook was banned in the People's Republic of China, public promising, among other things, that Renren would not become an investment company (id.). When Renren's popularity as a social media platform declined, however, Messrs. Chen and Chao used the IPO proceeds to make various investments which had the effect of turning Renren into an investment company (id., at *5). When these investments appreciated, Messrs. Chen and Chao hatched a plan to seize the profit for themselves. They first made a $500 million offer which the stockholders promptly rejected. Next, Messrs. Chen and Chao sought to spin off Renren's valuable investments, claiming that [*8]they were merely avoiding Renren's designation as an investment company under the Investment Company Act (id.). They announced a plan to spin off Renren's investments by (i) selling the assets to a wholly owned subsidiary, OPI, for a token consideration of 5% of the investments' book value, and then (ii) transferring ownership of OPI via a private placement (id., at *7). Mr. Chen was the director and CEO of OPI and allegedly hired Duff & Phelps to reverse engineer the value of OPI's assets to ensure that the value of OPI ended up at $500 million, i.e., the same exact amount that Messrs. Chen and Chao offered the stockholders, which as discussed above, the latter had swiftly and strongly rebuffed (id.). Armed with this allegedly cooked $500 million valuation, the private placement presented a Hobson's choice  either (i) accept a cash dividend based on the fake $500 million valuation of OPI (i.e., the same exact offer they had denied earlier) or (ii) receive shares of OPI only if they qualified as both "accredited investors" and "qualified purchasers" — i.e., investors who had a net worth of at least $1,000,000 (excluding primary residences) and at least $5,000,000 in investments (id.). The investors then sued in New York. The Renren defendants moved to dismiss arguing lack of personal jurisdiction. This Court denied the motions to dismiss based on lack of personal jurisdiction holding that Messrs. Chen and Chao's manipulation of the New York markets as part of their scheme to divest Renren, a Cayman Islands company whose principal place of business was China, of its most valuable assets in violation of their fiduciary duties alleged an articulable nexus or substantial relationship between the claims asserted and New York such that jurisdiction was proper under CPLR 302(a)(1). On appeal, as discussed above, the Appellate Division affirmed holding that the plaintiffs established that the Court had personal jurisdiction over Renren, OPI, and its directors and majority shareholders and otherwise rejected the defendants' arguments:
since the plaintiffs established those defendants transacted business in New York for purposes of CPLR 302(a)(1) in connection with the transaction at issue, and that jurisdiction comported with due process (see Licci v. Lebanese Can. Bank, SAL, 20 NY.3d 327, 339-340, 960 NYS.2d 695, 984 NE.2d 839 [1012]). Contrary to defendants' arguments, plaintiffs causes of action arise from defendants' New York contacts, since plaintiffs demonstrated that, in light of all of the circumstances, there is an articulable nexus or substantial relationship between the transactions and the claim asserted(id.) The court also properly determined that the directors and majority shareholders were primary actors with respect to the transactions at issue under Kreutter v. McFadden Oil Corp., 71 NY.3d 460, 467, 527 NYS.2d 195, 522 NE.2d40 (1988).
(Matter of Renren, Inc., 192 AD3d 539 [1st Dept 2021] [emphasis added]). The same result is required here. 
As discussed above, Messrs. Mo and Dai used and manipulated the New York markets to breach their fiduciary duties in orchestrating and consummating the Transaction to loot Fang for their own benefit. This was not merely a spin-off (cf. Wiwa v Royal Dutch Petroleum Co., 226 F 3d 88, 97 [2d Cir 2000]). Here, there was much more and like Renren, the Transaction involved a significant number of critical New York contacts such that jurisdiction is proper under CPLR § 302(a)(1) because there is an articulable nexus or substantial relationship between the transactions and the claim asserted. 
The assertion of jurisdiction here also comports with due process. The defendants here purposefully availed themselves of the privileges of New York and given the multiple New York contacts, they should reasonably expect to be defend this lawsuit in New York. 
The Court has Long Arm CPLR 302(a)(1) Jurisdiction over Messrs. Mo and Dai
Messrs. Mo and Dai separately argue that this Court lacks jurisdiction over them because they are citizens of the People's Republic of China and do not have sufficient contacts with New York to support the exercise of personal jurisdiction. They argue that the AC fails to allege with any specificity facts that would justify jurisdiction over them by virtue of their roles as controlling shareholders and directors of Fang and CIH. They are not correct.
The critical issue is whether Messrs. Mo and Dai were "primary actors" with respect to the Transaction and Fang's business in New York such that they are subject to personal jurisdiction pursuant to CPLR § 302 (a)(1). 
Where a corporation engages in purposeful activities within New York with respect to the subject transaction with the knowledge and consent of the defendant, the court has personal jurisdiction over a defendant by virtue of the corporation's activities where the defendant benefited from the transaction and exercised some degree of control over the corporation in relation to the transaction (Retail Software Servs., Inc. v Lashlee, 854 F 2d 18, 21-22 [2d Cir 1988]). A plaintiff asserting personal jurisdiction over a defendant based on the actions of his or her corporate agent need not establish a formal agency relationship (Kreutter, 71 NY2d at 467). The plaintiff "need only convince the court that [the] Company engaged in purposeful activities in this State in relation to [the] transaction for the benefit of and with the knowledge and consent of the . . . defendants and that they exercised some control over [the] Company in the matter" (id.). To satisfy the element of control, the plaintiff must allege in sufficient detail that the defendant was a primary actor in the subject transaction (Coast to Coast Energy, Inc. v Gasarch, 149 AD3d 485, 487 [1st Dept 2017]). 
As discussed above, the gravamen of the AC is that Messrs. Mo and Dai orchestrated and consummated the Transaction in order to monetize CIH for their own benefit and without losing any control over it at the expense of Fang and its other shareholders. The AC spells out in haec verba allegations which support the conclusion that Messrs. Mo and Dai were primary actors such that this court has personal jurisdiction over them: (i) Mr. Mo came to ring the bell on the day of Fang's IPO (NYSCEF Doc. No. 15, ¶ 2), (ii) Mr. Mo owned between 71% to 85% of the voting power in Fang during the relevant periods, which control was raised as a red flag in Fang's own securities filings (id., ¶¶ 20, 44), (iii) both Messrs. Mo and Dai personally signed allegedly misleading Fang securities filings (the former doing so apparently even after his supposed retirement) (id., ¶¶ 103, 105-109, 112-120), (iv) Mr. Dai signed agreements on behalf of Fang that resulted in the CIH take private transaction, including pledging Fang's cash to make it a reality (id., ¶ 118), (v) Mr. Dai, chairman of Fang during the CIH take private transaction, did not form an independent special committee at Fang to assess the transaction, which when combined with his signatures on the documents and his own conflicted status, strongly suggests that he controlled Fang in preventing formation of a special committee and prevented Fang from performing diligence of any kind on the deal (id., ¶¶ 148), and (v) Mr. Mo is alleged to have [*9]been the mastermind who orchestrated the entire Transaction from start to finish (NYSCEF Doc. No. 15, ¶¶ 6-7). Thus, and based on the AC including the foregoing allegations, Messrs. Mo and Dai were primary actors and are therefore subject to personal jurisdiction pursuant to CPLR § 302 (a)(1).
II. Forum non-conveniens also does not warrant dismissal
CPLR 327 codifies the common law doctrine of forum non-conveniens. Under CPLR 327, a court may dismiss an action if it "finds that in the interest of substantial justice the action should be heard in another forum." The resolution of a motion to dismiss on forum non-conveniens grounds is left to the sound discretion of the trial court (Islamic Republic of Iran v Pahlavi, 62 NY2d at 479). 
Courts consider the burden on New York courts, potential hardship to the defendant, the unavailability of an alternative forum in which the plaintiff may bring suit, the residence of the parties, and whether the transaction at issue arose primarily in a foreign jurisdiction (id.). Significantly, the plaintiff's choice of forum should rarely be disturbed unless the balance is strongly in favor of the defendant, and a substantial nexus between New York and the action is lacking (Waterways, Ltd. v Barclays Bank PLC, 174 AD2d 324, 327 [1st Dept 1991]; Elmaliach v Bank of China Ltd., 110 AD3d 192, 208 [1st Dept 2013]). In New York courts, a suit which concerns the internal affairs of a foreign corporation should be entertained unless forum non-conveniens principles suggest that New York is an inconvenient forum and that litigation in another forum would better accord with the legitimate interests of the litigants and the public (Broida v Bancroft, 103 AD2d 88, 91 [2d Dept 1984]). 
In support of their motion, the Defendants argue, among other things, that this case should be heard in the Cayman Islands because (i) it would be a better alternative forum, (ii) the predominantly foreign residency of the parties favors the Cayman Islands, (iii) the alleged wrongdoing took place abroad, (iv) the evidence and witnesses are abroad, (v) the law of the Cayman Islands will apply to the instant case, and (vi) the burden of this case on the New York courts favor dismissal. The arguments fail. 
New York has a strong interest in adjudicating this lawsuit and the factors which support specific jurisdiction establish a strong factual and legal connection to New York (Ehrlich-Bober & Co., Inc. v Univ. of Houston, 49 NY2d 574 [1980]). Despite now claiming New York to be inconvenient, Fang and Messrs. Mo and Dai are no strangers to New York, including with respect to Fang's corporate affairs. They have come to New York a number of times over the last 14 years including when Fang first sold its ADS on the NYSE. As discussed above, that is when Mr. Mo first rang the bell of the NYSE and raised money for Fang here in New York. Although this capital raise is not a predicate for jurisdiction in this case (the spin-off of CIH, also in New York, however is), this too weighs in favor of New York as an appropriate forum for this litigation. 
Significantly, the causes of action arise out of the defendants' New York contacts, and numerous agreements designate New York law and the New York forum (NYSCEF Doc. No. 15, ¶ 41; see, e.g., NYSCEF Doc. No. 127, § 20[b]; NYSCEF Doc. No. 100, § 13[l][i]) thus [*10]making New York both foreseeable and the appropriate place for this action to be litigated (cf. Holzman v. Guoqiang Xin, 2015 WL 5544357 *10 (S.D.NY Sept. 18. 2015) [dismissing on forum non-conveniens grounds because the Court held that the dispute "does not arise out of the Defendant's contacts with New York"]).
As a practical matter, New York also appears to be the most convenient forum for Fang and Messrs. Mo and Dai to defend the claims asserted and the Defendants have made virtually no credible showing demonstrating that litigating in New York would be inconvenient or that litigating in the Cayman Islands would be more convenient (see NYSCEF Doc. No. 173, at 13-14). It is simply false that there is no relevant evidence located in New York (see id., at 14).[FN2]
The Plaintiffs have already sought to obtain evidence from (1) JPMorgan Chase, who was involved in the CIH spin-off, (2) the NYSE, on whose platform Fang's ADSs were listed and eventually delisted, and (3) the NASDAQ, on whose platform CIH's ADSs were listed (NYSCEF Doc. No. 116, ¶ 15). To the extent that the Defendants argue otherwise, their arguments amount to little more than Messrs. Mo and Dai are from China and many decisions were made in board rooms located in China notwithstanding their New York impact. Plaintiff Lorelei is a New York corporation, and the Affiliates are all British Virgin Islands companies that are based in the British Virgin Islands (NYSCEF Doc. No. 15, ¶¶ 22-23, 25). Indeed, Oasis and Fang are the only Cayman Islands entities. It is of little concern that Chinese translators may be employed here in New York as they would also be employed in the Cayman Islands.
In fact, none of this bodes in favor of dismissal in favor of the Cayman Islands forum where a winding-up proceeding would be appropriate. Indeed, on the record before the Court, there does not appear to be any evidence relevant to the instant litigation in the Cayman Islands (see NYSCEF Doc. No. 110, 20-21) and any evidence located in China or Hong Kong would no more susceptible to discovery in a Cayman Islands proceeding than in this one. The Commercial Division is often called upon to apply foreign law and the burden on this Court is simply not substantial. As such, the Defendants have not overcome the Plaintiff's choice of forum, nor have they demonstrated that the Cayman Islands is a more convenient forum, and dismissal based on forum non-conveniens is simply not appropriate (Waterways, 174 AD2d at 327).[FN3]
Thus, [*11]dismissal based on Holzman is not appropriate.
III. The action is not time-barred.
The Defendants argue that this lawsuit must be dismissed as time-barred because they argue that the applicable statute of limitations period is three years (see NYSCEF Doc. No. 104, at 18). They are not correct. This is a derivative action alleging breach of fiduciary duty against Messrs. Mo and Dai (present or former directors and officers). As such, the six-year statute of limitations applies (CPLR 213[7]). The claims accrued at the earliest with the spin-off of CIH in June of 2019. The lawsuit was brought on May 29, 2023 (NYSCEF Doc. No. 1). Thus, the claims brought are well within the six-year statute of limitations period CPLR 213(7). 
The Court has considered the Defendants' other arguments and finds them unavailing. 
Accordingly, it is hereby
ORDERED that the motions to dismiss are denied; and it is further
ORDERED that the motion for a stay is denied as moot; and it is further
ORDERED that the parties are to meet and confer as to a proposed discovery schedule in advance of the preliminary conference scheduled for May 9, 2024 &commat; 2 pm (and, if possible, to submit a stipulation to the Part-53 email address with such proposed schedule in advance of the scheduled preliminary conference).
DATE 5/2/2024
ANDREW BORROK, J.S.C.

Footnotes

Footnote 1:The Court notes that Mr. Dai represented on December 22, 2022, in connection with an eventual take private transaction (discussed below), that Fang (i) had sufficient funds to cover all of its current commitments and obligations in addition to providing $14.8 million and (ii) had no pending or threatened legal proceedings that would restrict them. (NYSCEF Doc. No. 101, § 7[a], [g].)

Footnote 2:A & M Exports, Ltd. v Meridien Intern. Bank, Ltd. (207 AD2d 741, 741 [1st Dept 1994]) and JTS Trading Ltd. v Asesores (178 AD3d 507 [1st Dept 2019]) are inapposite. In A & M Exports, for example, the foreign corporation parties conducted no business in New York save maintaining bank accounts (207 AD2d 741) which is decidedly not the case here. In JTS Trading, there were only "some initial contacts with one defendant's New York representative" and "[o]nly a single, peripheral witness" was located in New York (178 AD3d 507). This is a far cry from the instant case where the nexus with New York is substantial and the Defendants appear to own assets that may be used to satisfy a potential judgment (NYSCEF Doc. No. 116, ¶ 28).

Footnote 3:For the avoidance of doubt, as discussed above, Holzman v Guoqiang Xin (No. 12-CV-8405 AJN, 2015 WL 5544357, *2 [SD NY Sept. 18, 2015]) does not mandate a different result. As an initial matter, the Court notes that Holzman is not binding on this Court. Putting that aside, Holzman is inapposite. The company at issue in Holzman, like the company at issue in Renren and Fang, the company at issue in this case, involved a shareholder derivative action of a Cayman Islands company with its principal place of business in China, dismissal in that case was appropriate because the Court in that case held that the causes of action did not arise out of the New York contacts. As discussed above at length, this is different than the case at bar where each step of Transaction involved or resulted from the Defendants contacts with New York and many of the agreements designate New York law and the New York forum (Holzman, at *10). As such, dismissal based on Holzman is not appropriate.